

AO 91 (REV.5/85) Criminal Complaint                              AUSA Peter S. Salib (312) 697-4092

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
OCT 1 7 2013
10-17-13
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES OF AMERICA

v.

EURIPIDES CAGUANA,
    also known as "Caca"

CRIMINAL COMPLAINT

CASE NUMBER:

13 CR 823

MAGISTRATE JUDGE COLE

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about October 15, 2013, at approximately 6:30 p.m., at Chicago, in the Northern District of Illinois, Eastern Division EURIPIDES CAGUANA, also known as "Caca," defendant herein:

> did knowingly use a facility of interstate commerce, namely a cellular telephone operated on the interstate network of T-Mobile US, Inc., a cellular telephone service provider, with intent that a murder be committed in violation of the laws of the State of Illinois (720 ILCS 5/9-1), namely the murders of Individuals A and B, as consideration for a promise and agreement to pay anything of pecuniary value, namely approximately $7,500;

in violation of Title 18, United States Code, Section 1958. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
LORA BELLE RICHARDSON
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

October 17, 2013                         at      Chicago, Illinois
Date                                              City and State

JEFFREY COLE, U.S. Magistrate Judge
Name & Title of Judicial Officer                  Signature of Judicial Officer

UNITED STATES DISTRICT COURT  
NORTHERN DISTRICT OF ILLINOIS | ss

## AFFIDAVIT

I, LORA BELLE RICHARDSON, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for two and a half years. My current responsibilities include the investigation of violent crimes, including, among others, kidnaping, bank robbery, and the apprehension of violent fugitives.

2. This affidavit is submitted in support of a criminal complaint alleging that EURIPIDES CAGUANA, also known as Caca, has violated Title 18, United States Code, Section 1958. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging CAGUANA with the use of an interstate commerce facility in the commission of murder-for-hire, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, conversations with a cooperating

individual, and my review of documents, records, and consensually recorded conversations.[1]

4. On or about October 13, 2013, a Cooperating Individual ("CI")[2] told law enforcement that on or about October 11, 2013, CAGUANA,[3] known to the CI as Caca, called the CI's cellular phone[4] using phone number (312) 515-2353 (CAGUANA Phone). According to the CI, CAGUANA stated, in summary, that his son was incarcerated and awaiting trial in a state murder charge. CAGUANA stated, in summary, that two individuals, later identified as Individual A, and Individual B, were scheduled to testify at the murder trial against his son on or about October 23, 2013. CAGUANA wanted Individuals A and B killed on or before October 19, 2013, in advance of their testimony.

5. According to Circuit Court of Cook County records, CAGUANA's son is currently awaiting trial in the Circuit Court of Cook County, Illinois, and is

---

[1] References to statements from consensually recorded conversations do not include all statements or topics covered during the conversations. The language that is quoted from the recorded conversations is based on a preliminary review of the recorded conversations, not final transcripts. At various points in the Affidavit, I will offer my interpretations of certain recorded conversations in brackets and otherwise. My interpretations of these conversations are based on my knowledge of the investigation to date, the content and context of the conversations, prior and subsequent conversation, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations.

[2] The CI has prior convictions for narcotics and other offenses. The CI has provided information to law enforcement in the past which has proven to be reliable and was not paid for this information. No promises have been made by law enforcement to the CI in exchange for his cooperation in this matter.

[3] The CI has told law enforcement that the CI has known CAGUANA for approximately 10 years and is familiar with his voice. The CI positively identified the voice of the person who called him as CAGUANA.

[4] The CI's cellular telephone service is provided by T-Mobile US, Inc.

awaiting trial on murder and related charges. The next court date for CAGUANA's son's case is scheduled for October 23, 2013.

6. On or about October 13, 2013, the CI told law enforcement that the same day, CAGUANA and the CI spoke over the phone. CAGUANA stated, in summary, that he wanted to meet in person with the CI. CAGUANA further stated, in summary, that he wanted to have the two individuals, later identified as, Individual A and Individual B killed.

7. On or about October 14, 2013, the CI told law enforcement that earlier that same day, the CI met CAGUANA[5] at a restaurant located near the intersection of Addison and Pulaski to discuss the details of CAGUANA's plans to have Individuals A and B killed. According to the CI, CAGUANA stated, in summary, that CAGUANA had followed Individual A and Individual B around for some time to track their movements. CAGUANA provided the CI with printed out pictures of Individual A and Individual B, as well as notes on their respective movements. CAGUANA reiterated that he needed to have Individual A and Individual B killed by October 19, 2013. CAGUANA further stated, in summary, that he would give the CI approximately $500 in order for the CI to purchase a gun. Additionally, CAGUANA stated, in summary, that he would pay approximately $5,000 to $7,500 to have a hit man kill Individual A and Individual B. This meeting was not recorded or surveilled.

---

[5] On or about October 15, 2013, the CI was shown a known photograph of CAGUANA and positively identified CAGUANA as the person he met on October 14, 2013.

3

8. On or about October 15, 2013, at approximately 6:30 p.m., at the direction of law enforcement, the CI, using the CI's T-Mobile US, Inc. cellular phone, placed a consensually recorded telephone call to CAGUANA on the CAGUANA Phone. CAGUANA answered the CAGUANA Phone. The CI recognized CAGUANA's voice as the person answering the CAGUANA Phone. The CI and CAGUANA briefly discussed meeting each other in order for CAGUANA to provide the CI with the money to buy the gun. CAGUANA stated, "Why don't you come by the house [CAGUANA's house]?" The CI responded "I got dude [the hit man the CI was to arrange to commit the murders] on standby because he's ready. You got 'em, right [the money for the gun and/or the information on Individuals A and B]?" CAGUANA responded, "Yeah, yeah we're gonna do it, . . . we're gonna do it [have Individual A and Individual B killed]."

9. On or about October 15, 2013, at approximately 9:12 p.m., the CI met CAGUANA at a house the CI knew from prior interactions with CAGUANA was CAGUANA's residence in Chicago, Illinois. The CI was outfitted with a recording device in advance of this meeting. After the meeting concluded, it was discovered that the recording device malfunctioned and the meeting was not recorded. Law enforcement surveillance observed the CI and CAGUANA meet in the vicinity of CAGUANA's garage. Law enforcement recognized CAGUANA from having previously viewed a known photograph of CAGUANA. Shortly after meeting, the CI and CAGUANA entered CAGUANA's garage. According to the CI, while inside CAGUANA's garage, CAGUANA and the CI discussed where Individual A and

4

Individual B lived and when they leave their respective houses in the morning. CAGUANA took money out of the trunk of a Champagne Toyota sedan[6] and gave the CI $500 in United States currency in $100 bills for the purchase of a gun. CAGUANA and the CI discussed the CI hiring a hit man to kill Individual A and Individual B. CAGUANA stated he would pay $5,000 for the murder of Individual A and $2,000 for the murder of Individual B. Law enforcement observed CAGUANA and the CI exit the garage and observed the CI enter the driver's seat of the CI's vehicle and CAGUANA enter the passenger seat. Law enforcement surveillance also observed the CI drive the CI's vehicle in the vicinity of two specific residences, later confirmed by law enforcement to be associated with Individual A and Individual B, respectively. Law enforcement observed the CI drive the vehicle back to CAGUANA's residence. According to the CI, CAGUANA told the CI where to drive and pointed out the two residences of Individual A and Individual B. Once back at CAGUANA's garage, and outside the presence of law enforcement surveillance, according to the CI, the CI observed multiple stacks of $100 bills in a cooler in the trunk of the Champagne Toyota sedan. CAGUANA stated, in summary, that he had money all over his house. CAGUANA and the CI made plans to meet up the following day between the hours of 8:00 a.m. and noon to meet with a person who the CI understood to be the hit man.

10. On or about October 16, 2013, at approximately 10:31 a.m., at the direction of law enforcement, the CI, using the CI's cellular phone, placed a

---

[6] According to Illinois Secretary of State records, the Toyota sedan is registered to an individual identified as CAGUANA's brother.

consensually recorded telephone call to CAGUANA on the CAGUANA Phone. CAGUANA answered the CAGUANA Phone. The CI asked CAGUANA "where you at right now?" CAGUANA said he was at "Sheridan and Argyle." The CI told CAGUANA "I'm going to call my guy [the hit man] and could you meet me . . . we've got to go over everything [the plans to have Individual A and Individual B killed] . . ." and suggested a meeting location near "Addison and Pulaski." CAGUANA and the CI discussed several different locations to meet and they ultimately agreed on meeting at Chase Park near Clark Street and Leland Avenue in Chicago, Illinois, in approximately 20 minutes.

11. On or about October 16, 2013, at approximately 11:06 a.m., law enforcement observed CAGUANA meet with the CI and an Undercover Officer (the "UC"), posing as the hit man, at Chase Park near the intersection of North Ashland Avenue and West Leland Avenue in Chicago, Illinois:

    a. CAGUANA stated to the CI and the UC, "this guy's gotta go [be killed] first." CAGUANA discussed the details of the movements of Individual A and B with the CI and the UC by stating, "This guy here, he lives next door to me, he's the one I keep an eye on, I keep an eye on him and everything . . . he goes to work about seven, seven twenty in the morning . . ." CAGUANA further stated, "We gotta make sure we check him out . . . I showed [the CI] yesterday where he lives."

    b. The CI offered to have both Individual A and Individual B killed the same day. CAGUANA replied, "We can do them [kill Individual A and B] both at the same time . . . this one [Individual A or B] has to go [be killed] first." The CI

6

asked CAGUANA, "You want these two killed?" CAGUANA replied, "Yeah." The CI then asked CAGUANA, "How much you got right now?" CAGUANA stated, "Five thousand [$5,000] . . . we can go there and do [kill] this guy here [Individual A or Individual B] and then I can go to my house, boom, boom, I'll get the five thousand [$5,000] and then we'll go get this guy [the Individual A or B, whoever was not killed first]. The UC asked CAGUANA what the total amount to be paid for having both Individuals killed. CAGUANA stated, "Seven thousand five-hundred [$7,500]. I'll get the two thousand [$2,000], as long as it's done [both Individual A and Individual B are killed]. You'll get everything [$7,500]." The UC asked CAGUANA to give the UC at least $2,000 up front and that once the first person was killed, that CAGUANA deliver the balance of the money.

  c. The UC asked CAGUANA "So basically, you don't want them [Individual A and Individual B killed], though?" CAGUANA replied, "Yeah, no, no, no, I want 'em, both of 'em [Individual A and Individual B killed]." The UC asked CAGUANA, "You want 'em both dead?" CAGUANA replied, "Yup, I want both of them [Individual A and Individual B killed]." The CI later stated "We can do this right now [have Individual A and Individual B killed]. You want these guys dead?" CAGUANA said, "Oh, don't say that out loud." CAGUANA said "I want him and him [Individuals A and B killed]." The UC again asked CAGUANA for $2,000 [as a down payment]. CAGUANA agreed and stated, "Yeah . . ." Law enforcement surveillance observed CAGUANA, the CI, and the UC finish speaking and each entered their respective vehicles.

12. The CI later met with law enforcement and provided them with paper materials that CAGUANA provided the CI. These materials included additional identical copies of photographs of Individual A and Individual B and surveillance notes on the movements of Individual A and Individual B that CAGUANA previously provided the CI on or about October 14, 2013.

13. On or about October 16, 2013, at approximately 11:39 a.m. CAGUANA was arrested in his vehicle by members of the Chicago Police Department and the Chicago FBI.

14. T-Mobile is a cellular telephone service provider which operates an interstate cellular telephone network.

FURTHER AFFIANT SAYETH NOT.

LORA BELLE RICHARDSON
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on October 17, 2013.

JEFFREY COLE
United States Magistrate Judge